**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Case 2:10-cr-20066-SHM-cgc

JOHN VINCENT LABUDA,

        Defendant.

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

---

Before the Court is Defendant John Vincent Labuda's Motion to Suppress Evidence. (Docket Entry "D.E." #39). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. #40). The Magistrate Judge held a hearing on the instant motion on July 20, 2011. For the reasons set forth herein, the Magistrate Judge RECOMMENDS that Defendant's Motion to Suppress Evidence be DENIED.

**I. Proposed Findings of Fact**

On January 11, 2010, Detective Bruce Campbell of the El Paso, Texas Police Department Digital Forensics Unit was assigned to investigate evidence regarding a reported sexual assault involving a sixteen-year-old female runaway victim that was alleged to have been recorded on Defendant's cellular phone. (July 20, 2011 Hr'g Tr. "Tr." at 11). Detective Campbell had been an officer with the El Paso Police Department since 1988 and had held the rank of Detective since 1994. (Tr. at 9). He was primarily responsible for investigating digital evidence and was a founding

1

member of the Cyberlab Digital Forensics Unit, which was established to "retract, obtain and analyze digital evidence" and eventually evolved to include examining cellular phones as they became "more prevalent in the use of crimes." (Tr. at 10). Detective Campbell had received training in how to operate the variety of tools used for forensic examinations, including "EnCase, Secure View, [and] Device Secure" software programs, standard computers, a specialized Forensic Recovery Electronic Device ("FRED") computer, and a "variety of different type of adapters and write blockers." (Tr. at 10). Detective Campbell estimated that, before this assignment, he had conducted "maybe around a hundred or so" forensic examinations. (Tr. at 11).

Upon arriving at the scene, Detective Campbell observed Defendant and another adult female arrestee in one patrol car and the sixteen-year-old victim in another patrol car. (Tr. at 12-13). Detective Campbell did not speak to Defendant or the adult female, but he did interview the sixteen-year-old victim for approximately ten minutes. (Tr. at 13, 34). The sixteen-year-old victim advised that Defendant picked her up outside of Dallas, Texas, that they began traveling towards El Paso, Texas, and that they stopped at a truck stop at some unknown location where "they had oral sex and it was recorded on his phone." (Tr. at 13, 35). The sixteen-year-old victim estimated that the sexual encounter occurred between midnight and approximately 3:00-4:00 a.m. (Tr. at 35-36). Ultimately, Defendant transported the sixteen-year-old female to El Paso, Texas where the incident was reported and investigated. (Tr. at 13). Detective Campbell was not certain if the sixteen-year-old victim was accurate in her assessment of the time period in question, but he "took her at her word." (Tr. at 52). Based upon her information, Detective Campbell sought and obtained a search warrant for evidence pertaining to this offense. (Tr. at 14-16, 34-36). His Affidavit, which was introduced into the record as Exhibit 1, requested as follows: "Authority is sought to allow a trained computer forensic

examiner to examine all electronic storage media for evidence related to the manufacture of the digital recording of said sexual assault and any nude images of the 16 year old victim." (Exh. 1, ¶ 4; Tr. at 36).

The Search Warrant, which was introduced into the record at Exhibit 4, explicitly incorporated the substance of the Affidavit, found that the facts therein demonstrated probable cause for the issuance of a search warrant, and further provided that the warrant must be served within three days, exclusive of the day of its issuance and exclusive of the day of its execution. (Exh. 4). The Search Warrant was issued on January 11, 2010 at 7:20 p.m. (Exh. 4).

After obtaining the search warrant, Detective Campbell returned to the scene, seized the Blackberry cellular phone that "matched the description given by the victim" from a truck at the scene, and took it to his lab at the police headquarters to "try to acquire it and examine it." (Tr. at 16, 48). From the outset of the search, Detective Campbell testified that he sought to obtain video evidence because the sixteen-year-old victim "explained that the sexual encounters were recorded by the phone," and that he did not seek any other electronic data during his forensic examination. (Tr. at 15-16). He further stated that, while he believed the search warrant provided authority to examine all electronic storage media, he did not do so because he was searching specifically for video evidence. (Tr. at 52). Detective Campbell explained that he did not limit the date and time of his search for video evidence because it was "possible that there could have been evidence outside that time limit that would impact on the case." (Tr. at 53).

In the instant case, Detective Campbell stated that he proceeded with his standard procedure to conduct the forensic examination. (Tr. at 16). In doing so, Detective Campbell stated that he was familiar with the National Institute of Science and Technology ("NIST") and had received training

on conducting forensic examinations. (Tr. at 10, 39, 42-43). Detective Campbell testified that there is no way of knowing in advance which particular tool will work best for each phone. (Tr. at 53). Detective Campbell further explained that this uncertainty "has to do with the way the phones are made" and that "each model has a different way it operates." (Tr. at 17). Additionally, Detective Campbell testified that he did not look at the date and time on the phone to validate that it was correct before beginning the forensic examination because that was not how he was trained. (Tr. at 28-29, 51). Detective Campbell testified that a user could have manually altered the date and the time on the phone so that it would display an incorrect date and time. (Tr. at 28). Detective Campbell testified that users could also alter other information, such as "file names or extensions," but that he had no way of knowing whether that had occurred with this phone "without very extensive research and analysis." (Tr. at 28).

When he began the forensic examination, Detective Campbell initially attempted to utilize Secure View, which is designed specifically for cellular phone examinations and "[b]asically dumps the entire phone" in case the files are stored directly on the phone rather than on the memory card. (Tr. at 16, 38). This tool would have allowed him to view anything you "so designate it to do," including selecting certain files. (Tr. at 17). However, Secure View was unsuccessful, and he was not able to receive any information. (Tr. at 17, 38). Detective Campbell stated that this is not uncommon because "Secure View can only obtain certain . . . types of information from certain types of manufacturers and models." (Tr. at 17). Detective Campbell further testified that most picture and movie files are stored to memory cards instead of to the phone itself because of the large size of the files. (Tr. at 38).

Next, Detective Campbell proceeded to attempt to examine the data on the cellular phone's

memory card. To do so, Detective Campbell removed the memory card from the cellular phone, put it into an "micro adapter locked for read only," and connected it to his forensic computer. (Tr. at 18, 39). Detective Campbell said that the adapter that he had was not a "certified write blocker" for that specific phone but that if he had such a device, he would have used it. (Tr. at 39-41). Detective Campbell stated that he understood that NIST would advise to use a "certified write blocker" if "you have it for that item." (Tr. at 39-40). He testified the he did not know if the type of adapter he utilized was recommended by NIST. (Tr. at 40). When asked if the type of adapter he utilized could "break," Detective Campbell stated that "[a]nything can break." (Tr. at 41). However, he said that the adapter that he had would not allow any information on the phone to be altered during the forensic examination. (Tr. at 29).

Once he had connected the cellular phone's memory card to his forensic computer via the adapter, Detective Campbell attempted to utilize EnCase Version 5, which is an earlier model of the EnCase program. (Tr. at 18). Detective Campbell explained that the El Paso Police Department only had two copies of EnCase Version 6.12 due to "money, licensing, and cost," and that those two stations were already in use for other investigations. (Tr. at 18-19). Detective Campbell stated that he did not seek to wait until the two copies of EnCase Version 6.12 were available because Defendant was currently in custody and they "were working the case." (Tr. at 18, 46). Accordingly, Detective Campbell tried to examine the original files from memory card with EnCase Version 5. (Tr. at 18, 39). Detective Campbell stated that he was trained by Cyber Crimes, a private firm in Woodlands, Texas and an authorized vendor of EnCase, that it was appropriate to either examine the original files or acquire the files and view them. (Tr. at 42-43).

When Detective Campbell attempted to conduct the examination with EnCase Version 5, he

utilized a "preview mode" with a "gallery view" and utilized "filters" in the program to view only "[m]ovies.." (Tr. at 26-27, 41, 44). He explained that the filters he selected prevented him from viewing "a bunch of other information" and allowed him to "carve out the movies that were on it." (Tr. at 27). Otherwise stated, the filter "selects those items that have the extension that you're looking for and pulls them out and puts it into a table where you can look at them." (Tr. at 27). This table pane additionally displayed the dates and times when the video files were created. (Tr. at 47). Utilizing the video filters, Detective Campbell viewed the "table pane" of the EnCase program and tried to get the videos but could not view them. (Tr. at 53-54). Detective Campbell said he did not know precisely why EnCase Version 5 was not successful because he is "not a software programmer." (Tr. at 19). However, in the gallery view setting, he was able to observe five still photos of the sixteen-year-old victim nude. (Exh. 2 at 1). These photos were created on January 10, 2010 between 11:30 p.m. and 11:59 p.m. (Exh. 2 at 1). However, because he could not properly view the videos, he stated the "point was moot in trying to get an acquisition" of the evidence using EnCase Version 5. (Tr. at 54). Detective Campbell testified that EnCase Version 5 would have allowed him to further filter by date and time as well, but that he did not do so because it was "irrelevant" when he "filtered for movies" and "couldn't view any movies whatsoever" and it "became moot." (Tr. at 45). Ultimately, EnCase Version 5 did not retrieve any further evidence, and Detective Campbell ceased utilizing it. (Tr. at 19).

Next, Detective Campbell attempted to view the files directly from the memory card utilizing his forensic computer. (Tr. at 19-20, 29, 38-39). Detective Campbell "went straight to the directory and opened up that card and looked at the file structure" and "saw the file labeled videos," in which he saw ninety-nine video thumbnails. (Tr. at 20-21). He reiterated that he was only examining the

video files because the evidence he was seeking was a video recording. (Tr. at 38-39). He did not view or make any attempt to view other types of files, including documents, e-mails, text messages, short message systems ("SMS") or instant messages ("IM"). (Tr. at 20, 37). When he saw the thumbnails, he was not able to determine the content of the video from the thumbnails. (Tr. at 21). However, "most were titled by female names" but others were titled with "numbers only." (Exh. 2 at 1). Thus, he proceeded to begin viewing the videos "from the very first to the very last to see what these videos were about." (Tr. at 21, 37). He stated that the majority of the videos had no relevance and that he did not watch them in their entirety. (Tr. at 21). Many were reviewed and identified as adult pornography downloaded from an internet website. (Exh. 2 at 1).

Detective Campbell also proceeded to view the files that were titled numerically. (Exh. 2 at 1). While viewing a video titled "00046," Detective Campbell unexpectedly "came across a video of a small young blond child conducting fellatio on a male penis . . . adult." (Tr. at 21). The video lasted one minute, forty-eight seconds and was 3.81 megabytes in size. (Exh. 2 at 1). Detective Campbell observed that "the camera angle was from above the child as if the recipient of the fellatio was taking the recording." (Exh. 2 at 1). Detective Campbell testified that he was "shocked, upset" and concerned for the welfare of the young child, especially given that he did not know the "circumstances . . . involving this video" or "the making of this video." (Tr. at 22). Detective Campbell continued to view video files titled 00048, 00049, and 00050, which additionally contained video images of the same young child performing fellatio on the same adult male, as further detailed in the Supplemental Report. (Exh. 2 at 1-2). These videos lasted 24 seconds, 2 minutes and fifteen seconds, and thirty-seven seconds respectively. (Exh. 2 at 2). Detective Campbell stated that, before he had viewed this video, he "never saw" that the videos were date-

stamped December 24, 2009 and "never paid attention to it." (Tr. at 47, Exh. 2 at 1).

After viewing the videos involving the younger child victim, Detective Campbell was concerned as to whether Defendant was the male adult involved. (Exh. 2 at 2). Thus, he ceased his forensic investigation at that time and went to speak with Defendant, who had already been provided his Miranda rights and finished his interview with Detective Romo regarding the sixteen-year-old victim. (Tr. at 22, 24-25, 58). Detective Romo saw Detective Campbell before he sought to interview Defendant, and Detective Romo testified that "he had this look on his face like he was bothered," that he advised that "something else came up" that they needed to "investigate further," and that he showed Detective Romo the video that he had viewed regarding the young child. (Tr. at 60).

After updating Detective Romo, Detective Campbell asked Defendant if he would be willing to speak with him and watch some videos, and Defendant agreed to do so. (Tr. at 23). Detective Campbell took Defendant to the lab and, before playing the tape, advised Defendant that he wanted to know the identity of the adult male and the child. (Tr. at 23). Detective Campbell then played the video to Defendant, who "closed his eyes" and "just hung his head and didn't say anything." (Tr. at 23 & Exh. 2 at 2). Detective Campbell then advised Defendant that, if he did not identify the persons in the video, he would seek to ask the adult female that Defendant was arrested with if she could identify the individuals. (Tr. at 50). Defendant asked Detective Campbell not to do so and advised that the young child in the video was his six-year-old daughter, that he was the adult male in the video, and that he made the video recording. (Tr. at 24 & Exh. 2 at 2). Defendant was again advised of his Miranda rights. (Tr. at 24 & Exh. 2 at 2). Defendant then provided a formal statement regarding the offense involving his daughter in which he "admitted to sexually abusing

his two daughters." (Tr. at 24 & Exh. 2 at 2). At no time during his investigation regarding the video images of Defendant's daughter did Detective Campbell obtain or seek to obtain a second search warrant. (Tr. at 48).

Following his interview of Defendant, Detective Campbell continued his forensic examination to search for video evidence involving the sixteen-year-old victim. (Tr. at 24). Detective Campbell ultimately found four video files "of the female defendant having oral sex with the [sixteen]-year-old and [Defendant] having oral sex with the [sixteen]-year-old." (Tr. at 24, 36-37). These video files were dated on January 11, 2010 and indicated that they were created between midnight and 4:00 a.m., which was consistent with the sixteen-year-old victim's account. (Tr. at 35-37).

At the conclusion of Detective Campbell's forensic examination, at 2:40 p.m. on January 14, 2011, he "took the SC card" to one of the EnCase Version 6.12.1 stations, once it was available, and "used that to do an acquisition report to get the actual metadata out of the SD card." (Tr. at 26, 29-32). Detective Campbell utilized Version 6 because it was "the most updated and the most advanced that we had at that time and it was still during the scope of the search warrant" and "it does a better job that [Version 5] does." (Tr. at 26, 29-30). Additionally, Detective Campbell prepared a report about his complete forensic examination of the cellular phone.[1] (Tr. at 25). Detective Campbell had

---

[1] Detective Campbell's report was introduced as Exhibit 2 at the hearing before the Magistrate Judge on the instant motion. At the hearing, defense counsel initially objected to the introduction of the report because it stated that it was printed in April, 2011 at 8:44. (Tr. at 32). The United States further questioned Detective Campbell, who testified that he printed the report in April and did not do anything new or change anything on the report before he printed it out or when he printed it out. (Tr. at 33). Thus, the printed copy was the same as the copy that was originally stored electronically. (Tr. at 33). Defense counsel withdrew her objection to the report, and it was then admitted. (Tr. at 34).

no further involvement in the instant case other than forwarding the information from his examination to Detective Annette Cotton of the FBI Innocent Images Task Force in Memphis, Tennessee. (Tr. at 30, 51 & Exh. 2 at 2).

In response to Detective Campbell's testimony regarding his forensic examination, Defendant's counsel presented the testimony of Konstantinos Dimitrelos, President of Cyber Forensics 360, a non-profit and for-profit corporation that provides forensics solutions to law enforcement and private companies. (Tr. at 69). Mr. Dimitrelos is a former Secret Service Agent who has obtained computer forensics certifications from the Royal Canadian Mounted Police and the United States Treasury Department. (Tr. at 70). As a Secret Service Agent, Mr. Dimitrelos was in charge of fifteen electronic crime task forces and worked on cyber crimes from 1995-2005. (Tr. at 70). At Cyber Forensics 360, Mr. Dimitrelos is a subcontractor for Guidance Corporation, the producer of EnCase software, and is highly familiar with both Version 5 and Version 6. (Tr. at 71). Mr. Dimitrelos utilizes EnCase with civil e-discovery matters as well as with training law enforcement internationally on cyber terrorism and forensics. (Tr. at 72). Mr. Dimitrelos has testified as an expert on computers, cellular crimes, and triangulation in state and federal courts. (Tr. at 71). Without objection by the United States, Mr. Dimitrelos was designated an expert witness for purposes of the hearing on the instant motion. (Tr. at 72-73).

Mr. Dimitrelos testified that he had reviewed the report of Detective Campbell's forensic examination of the cellular phone in the instant case. (Tr. at 73). He testified that, at the outset of an investigation, a forensic examiner has no way to know which tools will be successful with a particular model cellular phone. (Tr. at 96). With respect to the initiation of the forensic examination, Mr. Dimitrelos testified that a forensic examiner should "always manually inspect" the

cellular phone at the beginning of the examination and compare that the date and time shown on the phone matched an accurate watch.  (Tr. at 87-88).[2]  Because Detective Campbell did not do so, Mr. Dimitrelos stated that he could not know if "the date and time is accurate in this case."  (Tr. at 87).

Next, Mr. Dimitrelos testified regarding the adapted Officer Campbell utilized to connect the memory card to his computer.  Mr. Dimitrelos testified that Officer Campbell did not utilize a certified write-blocker as recommended by NIST.  (Tr. at 79-80, 89-91).  Mr. Dimitrelos stated that the "exception to the rule" that such adapters should not be used is when it is "the only thing that a police department may have" to view the evidence.  (Tr. at 90).  However, under such circumstances, Mr. Dimitrelos testified that the forensic examiner must "validate the tool" and include in the report that it was validated before the memory card containing the evidence was placed in the adapter.  (Tr. at 79-80, 89-91).  Mr. Dimitrelos stated that Detective Campbell's report did not state that any such validation was performed.   (Tr. at 91).

Next, Mr. Dimitrelos testified regarding whether it was appropriate for a forensic examiner to examine the original files when utilizing EnCase Version 5 and Encase Version 6.  (Tr. at 76-77).  Mr. Dimitrelos stated that it is appropriate to first acquire an "exact copy" of the original files and that it is proper to examine those files rather than the originals.  (Tr. at 76).  Mr. Dimitrelos stated that "there's no training that teaches you to work off of original evidence," that there is "no reason whatsoever" to do so, and that "it is not sound forensic practices to work off of original evidence

---

[2]  With respect to the accuracy of the time, Mr. Dimitrelos was asked if the time zone in Dallas, Texas and El Paso, Texas was the same time zone as Memphis, Tennessee.  (Tr. at 88).  Mr. Dimitrelos replied, "We did check, but it is the same time zone."  (Tr. at 88).  However, upon review, while Dallas, Texas and Memphis, Tennessee are both in the Central Time Zone, see State v. Lowe, 1990 WL 160346, No. 141 (Tenn. Crim. App. 1990); State v. Glebock, 616 S.W.2d 897, 901 n.2 (Tenn. Crim. App. 1981), El Paso, Texas is in Mountain Time Zone, see Escobar v. Sutherland, 917 S.W.2d 399, 411 (Tex. Ct. App. 1996).

ever." (Tr. at 77, 91). Mr. Dimitrelos testified that acquiring and copying the images from a cellular phone memory card would only take "literally minutes." (Tr. at 77). He testified that then you would see the information in a preview, which is not a glimpse of the actual contents of an image or video, but rather a view of the file directory. (Tr. at 78).

Next, Mr. Dimitrelos testified regarding the ability of EnCase Version 5 and Version 6 to utilize time and date filters. (Tr. at 73-74, 83-86). He stated that it is "effortless" to filter data between certain dates and times, including restrictions from a search warrant. (Tr. at 73). Mr. Dimitrelos stated that he it was clear that Detective Campbell understood the filtering process and "[a]bsolutely" took steps to eliminate evidence that he was not seeking to obtain. (Tr. at 100). Mr. Dimitrelos prepared step actions to illustrate the process of utilizing filters in EnCase Version 5 and Version 6.[3] (Tr. at 73-74). He testified that this information was also included in the EnCase user manual and the "help menu," which contains specific examples of utilizing date and time filters. (Tr. at 74, 82).

Next, Mr. Dimitrelos testified regarding the use of the gallery view setting, which provides thumbnail images of the video contents, as well as whether the gallery view that Detective Campbell viewed would automatically open in EnCase software. (Tr. at 78-79). Mr. Dimitrelos testified that an examiner should have "no reason to get to gallery view to view images when you have a date and time criteria" and that gallery view does not "just come up." (Tr. at 78-79). Mr. Dimitrelos stated that a forensic examiner should be able to place filters, such as date and time restrictions, before viewing the gallery view. (Tr. at 82-83). However, when cross-examined, Mr. Dimitrelos testified

---

[3] The Step Actions prepared by Mr. Dimitrelos were introduced as Exhibit 5 to the hearing on the instant motion before the Magistrate Judge.

that he believed it is possible that the EnCase software could be set to open to gallery view upon use. (Tr. at 87, 99-100). Mr. Dimitrelos also clarified that he did not intend to insinuate that "it was done on purpose in this case." (Tr. at 87).

Finally, Detective Annette Cotton of the Shelby County Sheriff's Office FBI Crimes Against Children Task Force testified that she is currently the assigned case agent in this pending federal case against Defendant. (Tr. at 64). Detective Cotton stated that before Defendant was arrested on January 10, 2011 regarding the sixteen-year-old runaway victim, there was an open investigation being conducted by the Tennessee Department of Children's Services ("DCS") regarding allegations of sexual abuse by Defendant against a child. (Tr. at 65-67).

## II. Analysis

### A. Fourth Amendment

#### 1. *Search of Cellular Phone*

Initially, Defendant contends that the search of his cellular phone exceeded the scope of the warrant and thereby violated his Fourth Amendment rights. The Fourth Amendment provides as follows: "The right of the people to be secure in their persons, house, papers, and effects against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[4] The requirement that the warrant describe with particularity the items to be seized is intended "to prevent the use of

---

[4] Defendant asserts, and the United States does not contest, that Defendant had a reasonable expectation of privacy in the contents of his cellular phone and his vehicle such that the protections of the Fourth Amendment apply. See Katz v. United States, 381 U.S. 347, 361 (1967).

general warrants authorizing wide-ranging rummaging searches" that violate the prohibition against unreasonable searches and seizures. United States v. Hanna, — F.3d —, Nos. 09-1425, 09-2086, 2011 WL 3524292, at *10 (6th Cir. 2011) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)); United States v. Logan, 250 F.3d 350, 364 (6th Cir. 2001). Otherwise stated, items to be seized pursuant to a search warrant "must be described with sufficient particularity to prevent 'the seizure of one thing under a warrant describing another.'" United States v. Blair, 214 F.3d 690, 697 (6th Cir. 2000). However, "[w]hile a general order to explore and rummage is not permitted, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." Hanna, 2011 WL 3524292, at *10 (quoting United States v. Greene, 250 F.3d 471, 477 (6th Cir. 2001)). Therefore, "the scope of the warrant should be confined to evidence relating to a specific crime, supported by probable cause." Hanna, 2011 WL 3524292, at *10. A description of the evidence to be seized is "valid if it is as specific as the circumstances and the nature of the activity under investigation permit." Blair, 214 F.3d at 697.

If a warrant is issued that satisfies the particularity requirement, the executing officers must act within the scope of the authority granted by the warrant; however, if officers exceed the scope of the warrant, the Supreme Court has created a distinction between searching *places* outside the scope of the warrant and seizing particular *items* outside the scope of the warrant. Waller v. Georgia, 467 U.S. 39, 43 n.3 (1984). An officer flagrantly violates the limitations of a warrant only where he exceeds the scope of the warrant in the places searched rather than the items seized. Garcia, 496 F.3d at 507. If an officer flagrantly disregards the limitations of the warrant, the broad remedy for such unjustified intrusions on privacy is the suppression of *all* evidence seized during the search. Garcia, 496 U.S. at 507. However, even if an officer does not flagrantly disregard the

limitations of the warrant, a seizure of particular evidence may still be unlawful if it is not that type of evidence permitted to be seized by the warrant. Garcia, 496 U.S. at 507. If an officer merely seizes items beyond the scope of the warrant but does not search places not permitted by the warrant, the search is deemed to be considered warrantless only as to those unlawfully seized items. Garcia, 496 U.S. at 507 (quoting Waller, 467 U.S. at 43 n.3).

The exclusionary rule bars the introduction of any evidence that is obtained as a result of an unconstitutional search unless one of the well-delineated exceptions applies. United States v. Alexander, 540 F.3d 494, 501 (6th Cir. 2008); Katz, 389 U.S. at 357. One such exception is the inevitable discovery doctrine. Id. at 502. In Nix v. Williams, 467 U.S. 431(1984), the Supreme Court held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Id. at 444. To establish inevitable discovery, the government must show that the evidence would have been acquired through an independent source absent the government misconduct, United States v. Lazar, 604 F.3d 230, 239 (6th Cir. 2010), and "would have been discovered by lawful means," Nix, 467 U.S. at 444; see United States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996).

The Sixth Circuit has held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995). Further, the court "view[s] affairs as they existed at the instant before the unlawful search, [and] what would have happened had the unlawful search never

occurred." Id. at 498 (quoting United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992)). Otherwise stated, "although the government should not be allowed to profit from its misdeeds, it should not be 'put in a worse position.'" United States v. Johnson, 22 F.3d 674, 685 (6th Cir. 1994). While some speculation as to how events would have unfolded, absent an illegal search, may be necessary, speculation must be kept at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment. Lazar, 604 F.3d at 240.

### i. Particularity Requirement

In the present case, Defendant has not explicitly challenged the validity of the Search Warrant on the grounds that it does not meet the particularity requirement; however, the United States has argued that the Search Warrant was issued with sufficient particularity. Upon review, the Search Warrant was based upon Detective Campbell's Affidavit, which extensively set forth the basis of probable cause relating to the sixteen-year-old victim. On the basis of the Affidavit, the Search Warrant provided authority for a trained computer forensic examiner[5] to examine electronic storage media "*for evidence related to the manufacture of the digital recording of said sexual assault and any nude images of the [sixteen] year old victim.*" (Exh. 1) (emphasis added). The Sixth Circuit has previously held that warrants permitting searches for evidence "related to" certain events have not violated the particularity requirement of the Fourth Amendment. See, e.g., Logan, 250 F.3d at 365; Blair, 214 F.3d at 697.

---

[5] Defendant argues that Detective Campbell was not a "trained computer forensic examiner" pursuant to the "accepted protocol" announced in United States v. Comprehensive Drug Testing, Inc., 579 F.3d 989, 1006 (9th Cir. 2009). The United States correctly notes that this case was reversed in part and a revised superseding *en banc* opinion was issued that did not contain these protocols. See United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162 (9th Cir. 2010).

Based upon this language, the Court concludes that the Search Warrant was confined to evidence of a specific crime based upon probable cause. Given the unique challenges of digitally stored evidence, the Search Warrant was as specific as the circumstances and nature of the activity under investigation permitted, as it granted authority to search for evidence of the manufacture of the alleged sexual assault and other nude images of the minor victim. Furthermore, the Search Warrant was broad enough to provide the necessary flexibility as allowed under the law to complete a thorough and comprehensive investigation into evidence of the offense. Accordingly, the Court concludes that the Search Warrant itself was not overly broad and did not violate the particularity requirement.

### ii. Scope of Search Warrant Execution

Even though the Court has determined that the warrant was valid and issued with appropriate particularity, the Court must consider whether Detective Campbell acted beyond the scope granted by the warrant. To resolve this question, the Court begins by considering whether Detective Campbell searched "places" beyond those permitted by the search warrant in flagrant disregard of the warrant's requirements. Although the nature of an electronic search is of a different nature than a search of a physical space, this does not alter the analysis in this case. The Search Warrant detailed the "places" to be searched as "all electronic storage media." Detective Campbell did not search beyond the electronic storage media; on the contrary, Detective Campbell narrowed his search to only video files because he was specifically searching for video recordings. Accordingly, the Court finds that Detective Campbell did not flagrantly disregard the Search Warrant.

The next question is whether Detective Campbell searched in the proper places for items beyond the scope of the search warrant. This question raises more complex issues. Namely, although the Search Warrant permitted searches into "all electronic storage media," it also provided that the evidence to be searched for was "evidence related to the manufacture of the digital recording of said sexual assault and any nude images of the [sixteen]-year-old victim." Unlike a physical space, the cellular phone has methods to filter the data to allow investigators to view only certain items. Specifically, the cellular phone may be searched with date and time restrictions that allow investigators to see pertinent information without searching for evidence beyond that scope. It is clear from the record that Detective Campbell understood the ability to filter the electronic data in precisely this manner.

Thus, the question turns on whether Detective Campbell had a reasonable basis to search for evidence regarding the sixteen-year-old victim without utilizing a date and time restriction. Otherwise stated, did the Search Warrant provide Detective Campbell the authority to view all video files on the cellular phone to determine if they contained evidence related to the sixteen-year-old victim. The answer to this turns on the information in the record—and even more importantly, the information that is not in the record—regarding Defendant's connection with the sixteen-year-old victim.

The investigators were aware that the sixteen-year-old victim reported that the sexual assault occurred between approximately midnight and 3:00-4:00 a.m. on January 11, 2011. Although it is not contained in the record before the Court, the United States concedes that the "parties told officers that they had been traveling together in the tractor-trailer for approximately [twenty-four] hours." (Gov't Resp. at 2). The record—including the Affidavit presented to the magistrate

judge—is devoid of *any* proof that Defendant had any contact or connection with the sixteen-year-old victim before that occasion. Although Detective Campbell cursorily states that it was "possible that there could have been evidence outside that time limit that would impact on the case," there is not a scintilla of evidence supporting such a broad search of the cellular phone for images that were alleged to have been made within a relatively brief time span.

Further, by Detective Campbell's own admission, the time stamp on the video file titled 00046 on which he initially viewed sexually explicit images of Defendant's daughter indicated that it was created on December 24, 2009—over two weeks before the record indicates that investigators believed that Defendant encountered the sixteen-year-old victim. Even though Detective Campbell admitted that time stamp was clearly indicated on the thumbnail before he viewed the video, he also admitted that he "never paid attention" to this critical detail. Furthermore, after Detective Campbell realized that Defendant may have committed sexually related offenses involving at least one other victim, he did not attempt to obtain a search warrant regarding the child victim or even immediately interview Defendant at that time. Instead, he continued viewing files date stamped December 24, 2009, which contained additional sexually explicit images of the same act involving the young child. There was no authority for such a search pursuant to the warrant.

One further issue was raised regarding the accuracy of the date and time on the phone and whether details of particular files could have been altered. Detective Campbell stated that the date and time on the phone could have been altered, but his report did not indicate that he verified this detail by manually comparing the phone to an accurate clock. Mr. Dimitrelos stated that such a manual comparison should have been performed. As to the alteration of files, Detective Campbell stated that he would have had no way of knowing whether any alterations had been done "without

very extensive research and analysis." Even so, there is no evidence whatsoever in the record that investigators believed Defendant had the knowledge and ability to manually alter digital files so as to have them appear that they were made on incorrect dates. More importantly, any such speculation was not presented in the Affidavit for the issuing judge to consider permitting such a broad scope. Accordingly, the Court does not believe that the speculation of any possible alterations justifies the scope of this search.

Finally, while the United States argues that the scope may have been justified to locate material "evidence of intent, plan, motive or common scheme" in accordance with Rule 404(b) of the Federal Rules of Evidence, the fact remains that the scope of the authority to search Defendant's cellular phone was based upon the authority granted in the Search Warrant. The Affidavit recited the victim's account that the alleged sexual assault occurred during a brief time period and did not indicate that there was any lengthy span of time during which investigators believed that Defendant corresponded, schemed, or planned the sexual assault. It was the substance of the Affidavit that the issuing judge relied upon to grant the authority to execute the search. Thus, the Court finds that any attempt of investigators to search for evidence not reasonably related to the time frame provided by the victim, no matter whether it may or may not be admissible under the Federal Rules of Evidence, was beyond the scope of the Search Warrant.

Ultimately, although Detective Campbell did prudently narrow his search in ways that were not required by the warrant, specifically by not viewing any files other than videos, that does not negate the fact that he also improperly broadened his search to include dates and times that the record reflects he had no reasonable basis to believe that Defendant may have been engaged in or recording sexual offenses relating to the sixteen-year-old victim about whom the Search Warrant

was issued. Accordingly, the Court finds that Detective Campbell exceeded the scope of the Search Warrant in his seizure of evidence that had no temporal proximity to the sexual assault of the sixteen-year-old victim.

### iii. Inevitable Discovery

Although the Court concludes that Officer Campbell exceeded the scope of the warrant, the analysis does not end here. Instead, the Court must still consider whether the inevitable discovery doctrine provides an exception to render the seized evidence admissible. See, e.g., United States v. Smith, 510 F.3d 641, 647 (6th Cir. 2007) (reasoning that even if a search is conducted outside the scope of a search warrant, it may still be deemed valid pursuant to any of the exceptions to the warrant requirement).

In the instant case, Detective Cotton testified that before Defendant was arrested on January 10, 2011 regarding the sixteen-year-old runaway victim, there was an open investigation being conducted by the Tennessee Department of Children's Services regarding allegations of sexual abuse by Defendant against a child. While the record only contains scant detail regarding this investigation, there is no evidence to indicate that the DCS investigation was in any way related to the instant investigation regarding the sixteen-year-old victim. Therefore, it appears to be an entirely independent investigation that is wholly untainted by any misconduct.

As the DCS investigation specifically pertained to investigations of child sexual abuse, the Court concludes that it is more likely than not that the evidence of the recorded sexual assault against Defendant's own six-year-old daughter would have been discovered by lawful means in this ongoing investigation. While the Court cannot engage in speculation, sound reasoning dictates that a child sexual abuse investigation would have unearthed recordings of such offenses. As other

courts have noted, it is "very common" is cases regarding child sexual offenses to find "photos of child pornography." <u>United States v. Serras</u>, 575 F.3d 1191, 1202 (11 Cir. 2009). This pertains not only to photos of the particular child victim but images of other child victims as well. <u>Id.</u>

The use of photographs and videotapes of child pornography is common among child sexual offenders for various reasons. Relying on Congressional Findings to the Child Pornography Prevention Act of 1996 (CPPA), the Supreme Court has recognized that materials depicting child sexual acts may be utilized to "encourage children to participate in sexual activity." <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 241 (2002) (quoting Congressional Finding (3), notes following 18 U.S.C. § 2251). The <u>Ashcroft</u> court explained that, "a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children 'having fun' participating in such activity." <u>Id.</u> The <u>Ashcroft</u> court further recognized that pedophiles may have sexually explicit photographs or videos for other reasons, including to "whet their sexual appetite" with pornographic images, which increases the creation and distribution of child pornography and the sexual abuse and exploitation of actual children. <u>Id.</u> (quoting Congressional Finding (4), (10(B)).

With such information well-accepted and readily available in the field of child sexual crime investigation, it belies reason that the DCS investigation would not have pursued a search into Defendant's photographs or videotapes, including those electronically stored on devices such as a Blackberry cellular phone that is able to readily and surreptitiously manufacture and view photographs and videotapes. Given their authority to investigate precisely these types of offenses, the Court believes that it is more likely than not that such evidence would have been located by independent and lawful means.

Accordingly, the Court concludes that while Detective Campbell exceeded the scope of the Search Warrant by viewing the video files with no temporal proximity to the sixteen-year-old victim, the prosecution has met its burden by a preponderance of the evidence that videos 0046, 0048, 0049, and 0050 containing sexually explicit images of Defendant's six-year-old daughter would have been inevitably discovered by the Department of Children's Services independent and untainted investigation. Therefore, the Magistrate Judge RECOMMENDS that Defendant's Motion to Suppress these four video files be DENIED.

### 2. Defendant's Statements

Additionally, Defendant contends that the statement he provided in response to Officer Campbell's questioning was in response to the allegedly illegally obtained video evidence and must be suppressed as fruit of the poisonous tree pursuant to Wong Sun v. United States, 371 U.S. 471 (1963). Before the fruit-of-the-poisonous-tree doctrine applies, there must be some "primary illegality" that has lead to the discovery of further evidence. Id. At 488 In this case, the Court has recommended to the District Judge that no Fourth Amendment violation occurred, and thus there is no taint that could affect the subsequently gathered evidence. Accordingly, the Court RECOMMENDS that Defendant's statements regarding his sexual abuse of his two daughters should not be suppressed under the fruit-of-the-poisonous-tree doctrine.

### B. Fifth and Sixth Amendment

Finally, Defendant asserts that his Fifth and Sixth Amendment rights were violated because he was interviewed regarding the images of the younger child victim without the benefit of counsel. Defendant did not provide any authority on the issue of the alleged violation of Defendants' right to counsel. However, the Court will briefly address each allegation.

With respect to the Fifth Amendment right to counsel, the record reflects that Defendant was subjected to custodial interrogation and thus was required to be advised of his Fifth Amendment rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). In this case, Defendant was appropriately provided his Miranda rights before Detective Romo interviewed him regarding the sixteen-year-old victim, which was also in advance of Detective Campbell's interview regarding the images of the younger child that was later determined to be Defendant's daughter. Defendant was provided his Miranda rights on a second occasion before he provided a formal statement regarding the sexual abuse of his daughters. Although the record does not contain Defendant's waiver of his rights on both occasions, it has not been contested, other than by cursory reference to an alleged Fifth Amendment violation, that Defendant did not invoke his Miranda rights and did not request counsel. Thus, the Court finds that the record is devoid of any evidence of violations of Defendant's right to counsel under the Fifth Amendment.

With respect to the Sixth Amendment right to counsel, these rights do not attach until after a prosecution has been commenced, either by way of a formal charge, a preliminary hearing, an indictment, an information, or an arraignment. McNeill v. Wisconsin, 501 U.S. 171, 175-76 (1991). There is no evidence in the record that the prosecution of Defendant, who had just been arrested earlier that day, had formally commenced to provide any Sixth Amendment protections. Accordingly, the Court RECOMMENDS that Defendant's request to suppress his statements for violations of the Fifth and Sixth Amendment be DENIED.

## III. Conclusion

For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

**DATED** this 13th day of October, 2011.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**