IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:10-20066 |
| | ) | |
| JOHN VINCENT LABUDA, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER MODIFYING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING THE DEFENDANT'S MOTION TO SUPPRESS**

Before the Court are Defendant's March 23, 2011 Motion to Suppress ("Motion to Suppress"), his November 16, 2011 Objection to Magistrate Judge Charmiane Claxton's Report and Recommendation on the Defendant John Vincent Labuda's ("Labuda") Motion to Suppress (ECF No. 69), and Plaintiff the United States of America's (the "Government") November 21, 2011 Objection to Magistrate Judge Claxton's Report and Recommendation (ECF No. 71.) In response to the Government's objection, Labuda filed supplemental objections to the Magistrate Judge's Report and Recommendation on November 28, 2011. (See ECF No. 71) ("Supp. Objections.") The Magistrate Judge recommended that the Court deny Labuda's Motion to Suppress. (See Report and Recommendation, ECF No. 62 ("Report").) Having reviewed the

1

objections, the Court MODIFIES the Report of the Magistrate Judge. The Motion to Suppress is DENIED.

## I. Procedural and Factual Background

On January 11, 2010, Detective Bruce Campbell ("Detective Campbell") of the El Paso, Texas Police Department Digital Forensics Unit was assigned to investigate evidence about a reported sexual assault on a sixteen-year-old female runaway (the "Victim").[1] (Report 1.) The assault was alleged to have been recorded on Labuda's Blackberry cellular telephone (the "Cell Phone"). (Id.) Detective Campbell was trained to operate several investigative programs and devices, including EnCase, Secure View, and Device Secure, and specialized Forensic Recovery Electronic Device ("FRED") computers.[2] (Id. at 2.) Campbell was a veteran of approximately 100 forensic investigations involving technology. (Id.)

When Detective Campbell arrived at the scene of the crime, he saw Labuda and his girlfriend in one patrol car and the Victim in another. (Id.) Detective Campbell interviewed the Victim for approximately ten minutes. (Id.) She said that Labuda had picked her up outside Dallas, Texas, and that he had

---

[1] Detective Campbell had been a detective since 1994 and was a founding member of the Cyberlab Digital Forensics Unit, which was established to "retract, obtain, and analyze digital evidence," including cellular telephones. (Report at 1-2.)

[2] Neither party denies that these programs were relevant or appropriate for Detective Campbell to use in his investigation. Detective Campbell was trained to operate other software programs and computers, but they are not relevant to this action.

driven her to El Paso. (Id.) Labuda had stopped the car at an unknown location between Dallas and El Paso, where he used his cell phone to record the Victim performing oral sex on him. (Id.) She estimated that the stop occurred between midnight and 4:00 a.m. on December 24, 2010. (Id.)

The Victim reported the sexual assault to authorities after arriving in El Paso. (Id.) Detective Campbell sought and obtained a search warrant (the "Search Warrant") on the basis of his interview with her. (Id.) The Affidavit in support of the Search Warrant states that "[a]uthority is sought to allow a trained computer forensic examiner to examine all electronic storage media for evidence related to the manufacture of the digital recording of said sexual assault and any nude images of the 16 year old victim." (Id. at 2-3.) The Search Warrant explicitly incorporates the substance of the Affidavit. (Id.at 3.) The Search Warrant was issued on January 11, 2010, at 7:20 p.m. (Id.)

After obtaining the Search Warrant, Detective Campbell returned to the scene, seized Labuda's Cell Phone, and took it to his lab for forensic examination. (Id.) Detective Campbell believed that the Search Warrant authorized him to examine all electronic storage media, but he refrained from conducting a comprehensive examination because he sought only video evidence. (Id.) He did not search other electronic data. (Id.)

Detective Campbell did not restrict his search by date and time because it was "possible that there could have been evidence outside that time limit that would impact the case." (Id.)

Detective Campbell testified that he followed standard procedures for conducting forensic examinations. (Id.) He claimed to have been familiar with the National Institute of Science and Technology ("NIST") and to have received training on conducting forensic examinations. (Id. at 3-4.) Detective Campbell testified that there was no way to know whether particular investigative tools would be compatible with different models of cellular telephones. (Id. at 4.) He did not look at the date and time on the Cell Phone to validate that it was correct before beginning his investigation because that was not how he was trained. (Id.) Detective Campbell testified that a cellular telephone user could have manually altered the dates and times of files so that they would display incorrect dates and times. (Id.) He testified that other cellular telephone users could alter file names and extensions, but that he had no way of knowing whether alterations had occurred without extensive research and analysis. (Id.)

The first investigative program that Detective Campbell used was Secure View, which was designed specifically for cellular telephone examinations. Secure View would have allowed Detective Campbell to view files that were stored directly on

Labuda's Cell Phone. (Id.) Secure View was incompatible with the Cell Phone. (Id.) That is common because Secure View can only obtain information from certain models and makes of cellular telephones.

Detective Campbell testified that most pictures and movie files are stored to memory cards rather than cellular telephones because of large file sizes. (Id.) He removed the memory card from the Cell Phone, put the card into a "micro adapter locked for read only," and connected the adapter to his forensic computer. (Id. at 4-5.) The "micro adapter" was not a "certified write blocker" for the Blackberry model he was searching. (Id. at 5.) Detective Campbell testified that he understood that NIST would have advised using a "certified write blocker," and he would have used one if it had been available. (Id.) He did not know whether his adapter was recommended by NIST. (Id.) Detective Campbell testified that his adapter would not allow alterations to the information on the Cell Phone during his forensic examination. (Id.)

Once he had connected the memory card to his forensic computer using the adapter, Detective Campbell used EnCase Version 5. (Id.) Detective Campbell explained that the El Paso Police Department had only two copies of EnCase Version 6.12, an updated version of EnCase, due to financial constraints. The computers with EnCase Version 6.12 were being used in other

investigations. (Id.) Detective Campbell stated that he did not wait until those work stations became available because Labuda was in custody. (Id.) Instead, Campbell examined the files from the memory card using EnCase Version 5. (Id.) He had been trained to use EnCase by Cyber Crimes, a private firm in Texas. During his training, he had learned that it was appropriate to examine the original files or acquire the files and view them. (Id.)

Detective Campbell used search filters to ensure that he viewed only movie files when he used EnCase Version 5. (Id. at 5-6.) Detective Campbell testified that the filters sorted file extensions and displayed them in a viewing gallery.[3] (Id.) A table in that gallery displayed the dates and times of the videos according to when they were created. (Id.) Detective Campbell was able to see movie files in the viewing gallery, but could not access their contents. (Id.) Detective Campbell was able to see five "still" nude photos of the Victim, each photo representing an individual movie file. (Id.) The files were dated January 10, 2010, and they appeared to have been created between 11:30 p.m. and 11:59 p.m. (Id.) Detective Campbell did not try "to get an acquisition" of the evidence using EnCase Version 5 because he could not view the videos. (Id.)

---

[3] Labuda objects to this finding of fact.

Ultimately, EnCase Version 5 did not retrieve additional evidence, and Campbell stopped using it. (Id.)

Detective Campbell attempted to view the files directly from the memory card by using his forensic computer. (Id.) He testified to going "straight to the directory and open[ing] up that card and look[ing] at the file structure." (Id.) A file labeled "videos" contained ninety-nine thumbnails. (Id.) Detective Campbell concentrated only on the video files and did not view or attempt to view other documents, emails, text messages, short message systems ("SMS"), or instant messages ("IM"). (Id. at 6-7.) Campbell was not able to determine the content of the videos from the thumbnails; they were labeled by female name or number. (Id. at 7.) He viewed every video, but most were irrelevant or were adult pornography that had been downloaded from the internet. (Id.)

While viewing a video titled 00046, Detective Campbell saw a small young blond child (the "Child") conducting fellatio on an adult. (Id.) The video was one minute, forty-eight seconds. (Id.) Detective Campbell observed that "the camera angle was from above the child as if the recipient of the fellatio was taking the recording." (Id.) Video files 00048, 00049, and 00050 contained video images of the Child performing fellatio on the same adult male. (Id.) Those videos lasted between fifteen seconds and two minutes. (Id.) Detective Campbell testified

7

that, before he viewed file 00046, he never saw that the videos were date-stamped December 24, 2009. (<u>Id.</u> at 7-8)

Detective Campbell was concerned that Labuda was the male portrayed in the videos. (<u>Id.</u> at 8.) He stopped his forensic investigation and spoke with Labuda, who had been read his <u>Miranda</u> rights and had recently finished an interview with Detective Romo ("Romo") about the Victim. Detective Campbell appeared "bothered" and suggested to Romo that Labuda needed to be questioned further. (<u>Id.</u>) Detective Campbell showed Romo the video of the Child. (<u>Id.</u>)

Detective Campbell asked Labuda if he would be willing to speak with him and watch some videos, and Labuda agreed. (<u>Id.</u>) They went to the forensics lab, and Detective Campbell asked Labuda, before they viewed the videos, for the identity of the adult male and the Child. (<u>Id.</u>) Detective Campbell played the video to Labuda, who "closed his eyes" and "just hung his head and didn't say anything." (<u>Id.</u>) Detective Campbell told Labuda that his girlfriend would be asked to identify the participants in the video, if he could not. (<u>Id.</u>) Labuda asked Detective Campbell not to ask his girlfriend and admitted that he was the male in the video and that the Child was his six-year-old daughter. (<u>Id.</u>) Labuda was again advised of his <u>Miranda</u> rights and provided a formal statement about the abuse of his daughter. (<u>Id.</u>) He "admitted to sexually abusing his two daughters."

(Id. at 8-9.) At no time during his investigation into the video images did Detective Campbell obtain or seek to obtain a second search warrant. (Id. at 9.)

After the interview, Detective Campbell continued his forensic examination to search for video evidence about the Victim. (Id.) He found four video files that showed the Victim having oral sex with Labuda and his girlfriend. (Id.) Those files were dated January 11, 2010. (Id.) The time stamps on the files indicated that they were created between midnight and 4:00 a.m. (Id.) The time stamps were consistent with the time the Victim said the oral sex occurred. (Id.)

After viewing the files, Detective Campbell took the "SC card" from the Blackberry to one of the now-open EnCase Version 6.12 stations. (Id.) He extracted metadata from the card and prepared a report about his complete forensic examination of the Cell Phone. (Id.) Other than forwarding the fruits of his investigation to Detective Annette Cotton ("Cotton") of the FBI Innocent Images Task Force in Memphis, Tennessee, Detective Campbell had no further involvement in the case. (Id. at 9-10.)

At the suppression hearing on July 20, 2011, Labuda offered the testimony of Konstantinos Dimitrelos ("Dimitrelos"). Dimitrelos is a subcontractor for Guidance Corporation, which produced EnCase Versions 6 and 6.12. (Id.) He was designated as an expert witness. (Id.) Dimitrelos testified that forensic

examiners should always manually inspect cellular telephones at the beginning of investigations and ensure the accuracy of the dates and times shown on the files. (Id. at 9-10.) Dimitrelos testified that, because Detective Campbell did not manually inspect the files, there would be no way to tell whether the dates and times were accurate. (Id. at 10.)

Dimitrelos testified that Detective Campbell did not use an NIST-recommended adapter when connecting the memory card to the forensics computer. (Id.) If NIST-certified adapters were not available, forensic examiners should have "validate[d] the tool" before placing the memory card in the adapter. Dimitrelos testified that Detective Campbell's report did not indicate whether he validated the adapter. (Id.)

Dimitrelos testified that forensic examiners should first copy inspected files before viewing them. (Id.) He claimed that "there's no training that teaches you to work off of original evidence." (Id.) Dimitrelos testified that "it [was] not sound forensic practice[] to work off of original evidence ever." (Id. at 11-12.) He claimed that acquiring and copying images from a cellular telephone memory card would take only minutes. (Id. at 12.)

Dimitrelos testified that it was "effortless" to filter data using time and date filters. (Id.) He stated that it was clear that Detective Campbell understood the filtering process

and took steps to eliminate evidence that he was not seeking to obtain. (Id.) Dimitrelos testified that time and date filters would not automatically create a gallery viewing area. (Id.) According to him, a forensic examiner should be able to use filters, such as time and date restrictions, before creating the viewing gallery. (Id.) However, Dimitrelos admitted that the EnCase software could be set up to open the gallery view upon use. (Id.)

Detective Cotton testified that, before Labuda was arrested on January 11, 2010, an investigation was being conducted by the Tennessee Department of Children's Services ("DCS") about allegations that Labuda had sexually abused a child. (Id.)

## II. Standard of Review

"A district judge must determine de novo any part of a magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). The district court is not required to review—under a de novo or any other standard—those aspects of the report and recommendation to which no objection is made. Thomas v. Arn, 474 U.S. 140, 150 (1985). The district court should adopt the findings and rulings of the

magistrate judge to which no specific objection is made. <u>Id.</u> at 151.

**III. Analysis**

**A. Objection to Proposed Finding of Fact**

Labuda objects to one finding of fact. He argues that Dimitrelos' testimony that investigators could set up a gallery view that opened upon use "is actually a true statement, but it is not a full characterization of the testimony and could possibly be misinterpreted." (<u>See</u> Def.'s Objections 1.) Labuda "wants to make it perfectly clear that . . . gallery viewing never automatically opens in EnCase. It is possible to make this happen only if someone deliberately alters the settings for it to do so." (<u>Id.</u> at 2.)

The Report and Recommendation states that, "when cross-examined, Mr. Dimitrelos testified that he believed it is possible that the EnCase software could be set to open to gallery view upon use . . . Dimitrelos also clarified that he did not intend to insinuate that 'it was done on purpose in this case.'" (Report 12-13) (citations omitted). At the Suppression Hearing, in response to a question about whether the gallery view feature automatically opened, Dimitrelos testified that "it's not a true statement that your images just show up like that." (Suppression Hr'g Tr. 79.) Later, while being cross-examined, Dimitrelos admitted that a user could set Encase so

that a file could come up in gallery view when he first used it. (Id. 100.) Dimitrelos clarified that opening the file in gallery view "is not possible at all ever in Encase." (Id.)

The Court sees no reason to reject or modify the Magistrate Judge's factual finding. Her finding of fact is clear. It is neither misleading nor ambiguous. "Dimitrelos testified that an examiner should have 'no reason to get to gallery view to view images when you have a date and time criteria' and that gallery view does not 'just come up.'" (Report 12) (citations omitted)(emphasis added). Dimitrelos added that "it is possible that the EnCase software could be set to open to gallery view upon use." (Id. at 13.) The Magistrate Judge's finding is consistent with Labuda's request. That she did not state her finding exactly as Labuda might have wished is not a ground for objection. Her Report is clear that a gallery view does not automatically open in EnCase. Labuda's objection is OVERRULED.

**B. Objections to Conclusions of Law**

Labuda objects to the Magistrate Judge's conclusion that, although Detective Campbell exceeded the scope of the Search Warrant, the video evidence was admissible under the inevitable discovery doctrine. (Def.'s Objection 2.) The Magistrate Judge concluded that the then-ongoing TDCS investigation into allegations of child sex abuse against Labuda made it more likely than not that the evidence of recorded sexual abuse

collected outside the scope of the Search Warrant would have been discovered. (Id. at 2-3.)

Labuda also objects to the Magistrate Judge's conclusion that it was unnecessary to address the legality of his statements because the underlying search was legal. Labuda argues that his statements to police should be suppressed because they were neither knowing nor voluntary. He contends that Detective Campbell improperly elicited his confession, which tainted his formal statement. Even if the Miranda warnings were sufficient, Labuda argues that they did not cleanse the taint of the illegal search.

The Government objects to the Magistrate Judge's conclusion that Campbell's search exceeded the boundaries of the Search Warrant. (Gov.'s Objection 4.) The Government argues that United States v. Richards, 659 F.3d 527 (6th Cir. 2011), which was decided two weeks after the Magistrate Judge's Report, established clearer parameters for electronic database and file searches. (Gov.'s Objections 2.) The Government contends that "the Richards court determined that seizure of images of child pornography other than those specifically sought in the warrant was not a violation of the Fourth Amendment, even though the server was set up with neatly compartmentalized segments and files." (Id.)

1. **Detective Campbell's Search Was Reasonable under Richards**

   a. **The Fourth Amendment**

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probably cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment's particularity requirement is intended to "'prevent the use of general warrants authorizing wide-ranging rummaging searches' that violate the prohibition against unreasonable searches and seizures." United States v. Hanna, 661 F.3d 271, 2011 U.S. App. LEXIS 16615, at *30 (6th Cir. 2011) (quoting United States v. Logan, 250 F.3d 350, 364 (6th Cir. 2001)); see also Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) (requiring a "particular description" of the things to be seized). Although broad and sweeping warrants to "explore and rummage" are not permitted, "the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." United States v. Greene, 250 F.3d 471, 477 (6th Cir. 2001). "[A] description is 'valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" Id. (quoting

United States v. Ables, 167 F.3d 1021, 1033 (6th Cir. 1999));
see also United States v. Blair, 214 F.3d 690, 697 (6th Cir.
2000). The scope of the warrant should be "confined to evidence
relating to a specific crime, supported by probable cause."
Hanna, 2011 U.S. App. LEXIS 16615, at *16-17. Overbreadth does
not doom an entire warrant; "rather, it requires the suppression
of evidence seized pursuant to that part of the warrant . . .
but does not require the suppression of anything described in
the valid portions." Id.

Officers must act within the scope of a warrant. See
United States v. Carmack, 426 F. App'x 378, 381 (6th Cir. 2011).
"For purposes of general search analysis, we will find that an
officer flagrantly disregards the limitations of a warrant only
where he 'exceed[s] the scope of the warrant in the places
searched' rather than the items seized." Id. (quoting United
States v. Garcia, 496 F.3d 495, 507 (6th Cir. 2007)) (emphasis
and internal parentheses omitted); see also Waller v. Georgia,
467 U.S. 39, 43 n.3 (1984). "The test for determining if the
officers engaged in an impermissible general search is whether
their search unreasonably exceeded the scope of the warrant."
Garcia, 496 F.3d at 507. The broad remedy for unreasonably
exceeding a warrant's scope is the suppression of all evidence
seized during the search. Id. Even if an officer does not
flagrantly disregard the limitations of the warrant, a seizure

of particular evidence may be unlawful if it is not the type of evidence permitted to be seized by the warrant. Id. "[W]here the officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching places not authorized in the warrant, the court must suppress the unlawfully seized items, but 'there is certainly no requirement that lawfully seized evidence be suppressed as well.'" Id. (quoting Waller, 467 U.S. at 43 n.3).

### b. The Warrant Was Particular

In her Report, the Magistrate Judge recommended, and the Court agrees, that the Search Warrant was sufficiently particular. The warrant provided for "evidence related to the manufacture of the digital recording of said sexual assault and any nude images of the 16 year old victim." Warrants that cover evidence "related to" underlying criminal offenses are sufficiently particular under the Fourth Amendment. See Logan, 250 F.3d at 365 ("[W]e find that the lower court correctly determined that the search warrant satisfies the particularity requirement. The search warrant at issue authorizes the seizure of items specifically related to false or fraudulent activity taking place within the context of the HUD/FHA co-insured loans and the GNMA mortgage-backed securities.") (emphasis added); see also Blair, 214 F.3d at 697 ("Thus, the warrant specified that the records sought were those related to drug-trafficking

17

activities and did not violate the particularity requirement of the Fourth Amendment.") (emphasis added). Federal courts agree that "a warrant authorizing the seizure of a defendant's home computer equipment and digital media for a subsequent off-site electronic search is not unreasonable or overbroad, as long as the probable-cause showing in the warrant application and affidavit demonstrate a 'sufficient chance of finding some needles in the computer haystack.'" United States v. Evers, No. 08-5774, 2012 U.S. App. LEXIS 2641, at *10-11 (6th Cir. Feb. 10, 2012) (quoting United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999)). Based on that framework, the warrant was particular.

### c. Under Richards, Detective Campbell's Search Was Within the Scope of the Warrant

The Magistrate Judge recommended, and the Court disagrees, that Detective Campbell's investigation exceeded the scope of the Search Warrant. (Report 21.) When the Magistrate Judge issued her Report and Recommendation, the Sixth Circuit had not addressed the scope of warrants in electronic investigations. The court has now addressed that issue in Richards, 659 F.3d 527.

In Richards, the defendant had maintained several child pornography sites that were operated from central servers in Los Angeles and contained approximately one terabyte (a thousand

gigabytes) of information.  See id. at 531.  The warrant issued by the magistrate judge authorized a search of "'BlackSun 66.54.91.171, Server #4, Cabinet #200.02, 1200 West 7th Street, Los Angeles, CA 90017.'"  Id. at 535 (citations omitted).  The search of the BlackSun server revealed that Richards' child pornography websites were stored in one of two hard drives on the server, along with several other websites containing pornography and child pornography.  Id. at 532.  Richards moved to suppress the fruits of the search and the seizure of the BlackSun server because the scope of the warrant was narrower than the search that had been conducted.  See id. at 535 (challenging on "grounds that the warrant authorized seizing only those sections of the server hosting [two websites].").

The Sixth Circuit affirmed the denial of Richards' motion to suppress.  Following recent decisions from other circuits, the court held that, "[w]hile officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant, . . . a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause."  Id. at 538 (quoting United States v. Burgess, 576 F.3d 1078, 1092 (10th Cir. 2009)).  Structuring the mechanics of warrants "unduly" restricts legitimate search

objectives.  Id. (quoting Burgess, 576 F.3d at 1094).  The Court
noted:

> A warrant may permit only the search of particularly
> described places and only particularly described
> things may be seized. As the description of such
> places and things becomes more general, the method by
> which the search is executed become[s] more important
> — the search method must be tailored to meet allowed
> ends. And those limits must be functional. For
> instance, unless specifically authorized by the
> warrant there would be little reason for officers
> searching for evidence of drug trafficking to look at
> tax returns (beyond verifying the folder labeled '2002
> Tax Return' actually contains tax returns and not drug
> files or trophy pictures).
>
> Respect for legitimate rights to privacy in papers and
> effects requires an officer executing a search warrant
> to first look in the most obvious places and as it
> becomes necessary to progressively move from the
> obvious to the obscure. That is the purpose of a
> search protocol which structures the search by
> requiring an analysis of the file structure, next
> looking for suspicious file folders, then looking for
> files and types of files most likely to contain the
> objects of the search by doing keyword searches.
>
> But in the end, there may be no practical substitute
> for actually looking in many (perhaps all) folders and
> sometimes at the documents contained within those
> folders, and that is true whether the search is of
> computer files or physical files. It is particularly
> true with image files.

Id. at 539 (quoting 576 F.3d at 1094).  Analogizing computer
searches to large-scale document searches, the Court opined that
"investigating officers may examine, 'at least cursorily,' some
'innocuous documents . . . in order to determine whether they
are, in fact, among [those documents] authorized to be seized.'"
Id. at 539 (quoting Andresen v. Maryland, 427 U.S. 463, 482 n.11

(1976)).  Applying those standards, the Sixth Circuit concluded that the evidence obtained was within the scope of the search warrant.  Id. at 541-42.

In her Report, the Magistrate Judge concluded, and the Court disagrees, that Detective Campbell's search of files outside the date/time restrictions was outside the scope of the Search Warrant.  (Report 19-20.)  The Magistrate Judge reasoned that, "[a]lthough Detective Campbell cursorily states that it was 'possible that there could have been evidence outside [the date/time restrictions] that would impact on the case,' there is not a scintilla of evidence supporting such a broad search of the cellular phone for images that were alleged to have been made within a relatively brief span of time."  (Report 19.)  The Magistrate Judge's reasoning depends, in part, on the availability of the date and time stamp on video 00046, which was apparently filmed two weeks before Labuda met the Victim.  (Id.)

Richards addresses these issues and directs a different conclusion.  Detective Campbell's search was within the scope of the Search Warrant, which permitted him to search "all electronic storage media related to" the sexual abuse of the Victim.  He searched exclusively for video files.  A restricted video search was the "most obvious place" to begin his inquiry. Id. at 539.  "In general, '[s]o long as the computer search is

limited to a search for evidence explicitly authorized in the warrant, it is reasonable for the executing officers to open the various types of files located in the computer's hard drive in order to determine whether they contain such evidence.'" Id. at 540 (quoting United States v. Roberts, No. 3:08-CR-175, 2009 U.S. Dist. LEXIS 123188, at *15 (E.D. Tenn. Jan. 14, 2010)). The Search Warrant did not require Detective Campbell to limit his search to the date and time of the alleged sexual assault on the Victim. He did not restrict his search based on date and time because "there could have been evidence outside that time limit that would impact the case." See id. at 535 (citing United States v. Stabile, 633 F.3d 219, 237 (3d Cir. 2011)). As Detective Campbell also testified, cellular telephones can be manually altered to display incorrect dates and times.

After concluding his search of the most obvious places, Detective Campbell was justified in searching the more "obscure" video files that were numbered by female name and number because "[c]omputer records are extremely susceptible to tampering, hiding, or destruction, whether deliberate or inadvertent . . . . Criminals will do all they can to conceal contraband, including the simple expedient of changing the names and extensions of files to disguise their content from the casual observer." United States v. Hill, 459 F.3d 966, 978 (9th Cir. 2006). The video files recovered from Detective Campbell's

search were related to the sexual abuse of the Victim because, as the Detective testified, it was possible that there was relevant evidence outside the time limits and the dates and times could be altered. "[A] computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause." Richards, 659 F.3d at 538.

Concerns about permitting general warrants in electronic searches are not present in this case. See id. at 539 ("As the description of such places and things becomes more general, the method by which the search is executed become[s] more important—the search method must be tailored to meet allowed ends."). Detective Campbell searched Labuda's Cell Phone and found videos in accordance with the Search Warrant. The four videos found were on the Cell Phone. Although Detective Campbell did not restrict his search based on date and time, it is "generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." Dalia v. United States, 441 U.S. 238, 257 (1979). Detective Campbell conducted a narrow search of video files. He viewed additional files only after seeing immediately recognizable nude "still photos" on EnCase. Searching additional files for child pornography was reasonable after viewing those images. "Reasonableness . . . is judged

from the perspective of the officer at the time of the search, not with the benefit of 20/20 hindsight." Johnson v. Manitowoc Cnty., 635 F.3d 331, 335 (7th Cir. 2011). Detective Campbell's search was reasonable.

"[E]ven evidence 'not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant.'" Wheeler v. City of Lansing, 660 F.3d 931, 939 (6th Cir. 2011) (quoting United States v. Brown, 49 F.3d 1162, 1169 (6th Cir. 1995)); see also United States v. Savoy, 280 F. App'x 504, 510 (6th Cir. 2008). "Thus, if something 'constitute[s] evidence of the commission of a criminal offense and was [the basis] of a crime[,] [i]t [can] be seized although not specifically listed in the search warrant.'" Id.; see also Savoy, 280 F. App'x at 510 (finding that tapes were "reasonably related to the offense that formed the basis of [the] search warrant."). Labuda's video files were "reasonably related to the offense that formed the basis of his search warrant" because they were evidence of sexual assault. Savoy, 280 F. App'x at 510. "The fact that after reviewing the [files] the officers realized that some of the [files] did not contain evidence of [the victim's sexual assault], but instead contained images of minors engaged in sexual acts with adults, is of no consequence." Id. An officer making a valid search may seize property found on or within the object searched, even though the

officer "was not aware that such property was on the [object] when the search was initiated." Id. (citing Harris v. United States, 331 U.S. 145, 155 (1947)).  Detective Campbell's search did not exceed the scope of the Search Warrant.

## 2. Exceptions to the Warrant Requirement

The Exclusionary Rule bars the admissibility of items seized during an unconstitutional search unless an exception to the Fourth Amendment's warrant requirement applies.  United States v. Katz, 389 U.S. 347, 357 (1967); see also United States v. Alexander, 540 F.3d 494, 501 (6th Cir. 2008).  Even if the Court had concluded that Detective Campbell's search exceeded the scope of the Search Warrant, the inevitable discovery and plain view exceptions to the Fourth Amendment would make the evidence admissible.

### a. Inevitable Discovery

"'[T]he inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered.'"  Alexander, 540 F.3d at 502 (quoting United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995)).  The inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at

the instant before the unlawful search, what would have happened had the unlawful search never occurred." Id. The burden of proof is "on the government to establish that the tainted evidence 'would have been discovered by lawful means.'" United States v. Leake, 95 F.3d 409, 412 (6th Cir. 1996)). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." United States v. Lazar, 604 F.3d 230, 240 (6th Cir. 2010) (quoting United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999)). Although "some speculation as to how events would have unfolded, absent an illegal search, may be necessary, 'we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment.'" Id. (emphasis omitted).

The Magistrate Judge concluded that the video files would have been discovered, absent Detective Campbell's search, through an open investigation that was being conducted by the TDCS. (See Report 21.) The Magistrate Judge found that, although the evidence was "scant," the TDCS investigation was independent of Labuda's current case. (Id.) Acknowledging that courts "cannot engage in speculation," the Magistrate Judge concluded that "sound reasoning" dictates that a child sexual abuse investigation would have uncovered the recordings of

sexual abuse. (Id.) She relied on extra-jurisdictional authority that found it to be "very common" in child sex abuse cases for authorities to find photos of child pornography. (See id. at 21-22) (quoting United States v. Serras, 575 F.3d 1191, 1202 (11th Cir. 2009). She also relied on Ashcroft v. Free Speech Coalition, 535 U.S. 234, 241 (2002), which interpreted congressional findings supporting the Child Pornography Prevention Act of 1996 (CPPA) to suggest that child sex abusers create and distribute child pornography using photographs and videos. (Report 22.) Based on those sources, the Magistrate Judge concluded that, "[w]ith such information well-accepted and readily available in the field of child sexual crime investigation, it belies reason that the DCS investigation would not have pursued a search into Defendant's photographs or videotapes, including those electronically stored on devices such as a Blackberry cellular phone." (Id.)

The suppressed evidence inevitably would have been found. Detective Cotton testified that there was an ongoing and independent investigation pertaining to Labuda and a small child who was not Labuda's.[4] It is reasonable to believe that the parents of a small child, on learning that Labuda had been

---

[4] Labuda contests whether the TDCS investigation pertained to sexual abuse of a young child. At the suppression hearing, Detective Cotton, in response to a question about whether the allegations against Labuda involved sexual abuse of a child, simply replied "Yes." (Tr. 64-67.) Labuda contends that the exchange does not identify an ongoing investigation of sex abuse against a child, but Detective Cotton's answer supports a contrary conclusion.

27

arrested for a similar crime, would have sought a warrant to search the Cell Phone for additional evidence of sexual abuse. This is not a case in which "the government asks us, in effect, to find that discovery [] of the suppressed evidence was inevitable simply because the law allows [warrants] to be issued." Lazar, 604 F.3d at 241. Instead, the Government has shown that it was sufficiently prepared to obtain a warrant for evidence of sexual abuse. Id. at 240.

### b. Plain View

The Government contends that the files could also have been seized under the plain view doctrine. "Four factors must be satisfied in order for the plain view doctrine to apply: (1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." United States v. Garcia, 496 F.3d 495, 508 (6th Cir. 2007).

### i. The Objects Were in Plain View

Detective Campbell testified that he was able to view nude "still" photos of the Victim. His testimony "was credible on the issue of whether the evidence was in plain view and the testimony was also corroborated by" the findings in the Magistrate Judge's Report. See United States v. Adams, No. 09-

20224, 2010 U.S. Dist. LEXIS 98182, at *41 (E.D. Mich. Mar. 10, 2010).

### ii.  The Officers Were Legally Present

"In order to determine whether the officers were legally present [], we begin with the [] warrant that was the basis for the officers' [search of Labuda's Cell Phone]."  United States v. McLevain, 310 F.3d 434, 439 (6th Cir. 2002));  see also Garcia, 496 F.3d at 508 (finding that, to be "legally present," officers must generally have probable cause and an opportunity to obtain a separate search warrant).  The Search Warrant permitted Detective Campbell to search the Cell Phone.  The Court has determined that the Search Warrant was valid.  The officers were legally present.

### iii. The Incriminating Nature of the Objects Was Immediately Apparent

The "immediately apparent" requirement "is a vital constraint on the plain view doctrine . . . [that] prevents police officers from engaging in general exploratory searches—an evil experienced and abhorred by our nation's founders."  Garcia, 496 F.3d at 510.  "[I]n determining whether an object's incriminating nature is 'immediately apparent,' we look to three factors, none of which is necessary but each of which is instructive: (1) 'a nexus between the seized object and the items particularized in the search warrant'; (2) whether the

'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity"; and (3) whether "'the executing officers can <u>at the time</u> of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.'" <u>United States v. Estes</u>, 343 F. App'x 97, 101 (6th Cir. 2009) (quoting <u>McLevain</u>, 310 F.3d at 441 (emphasis added)). "In addition to those three factors, we have specifically held that an object's incriminating nature is not immediately apparent if it 'appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity[.]'" <u>Adams</u>, 2010 U.S. Dist. LEXIS 98182, at *41 at 510-11 (quoting <u>Shamaeizadeh v. Cunigan</u>, 338 F.3d 535, 555 (6th Cir. 2003)). An officer must recognize "the incriminating nature of an object as a result of his 'immediate' or 'instantaneous sensory perception.'" <u>Garcia</u>, 496 F.3d at 511 (quoting <u>United States v. McLernon</u>, 746 F.2d 1098, 1125 (6th Cir. 1984)).

"[W]hen the officer [] comes upon child pornography, it becomes 'immediately apparent' that its possession by the [cell phone's] owner is illegal and incriminating." <u>United States v. Williams</u>, 592 F.3d 511, 522 (4th Cir. 2010). Detective Campbell watched the videos, both of the Victim and of Labuda's daughter, because they were directly related to the Search Warrant. He

viewed nude "still" photos of the Victim, which were intrinsically linked to criminal activity because she was a minor. There was no doubt that those videos and images were incriminating and illegal at the time. Their illegality was "immediately apparent."

### iv. The Officer Had a Right of Access

The requirement of a lawful right of access "means that generally an officer should get a warrant if possible before he seizes an item in plain view." McLevain, 310 F.3d at 442. Detective Campbell "had lawful access to the [videos] because [he was] executing a valid search warrant on the [cell phone] where the [images were recorded]." United States v. Carmack, 426 F. App' 378, 383 (6th Cir. 2011); see also Brown, 460 U.S. at 738-39, n.4; United States v. Atchley, 474 F.3d 840, 850 (6th Cir. 2007). "Because Detective [Campbell] was lawfully present when he observed [the videos], and because he had a reasonable belief that the [videos were child pornography]," he lawfully searched the video files without violating the Fourth Amendment. Carmack, 426 F. App' at 383. "[T]he officer, who is authorized to search the computer and electronic media for evidence of a crime and who is therefore legally authorized to open and view all its files, at least cursorily, to determine whether any one falls within the terms of the warrant, has 'a lawful right of

access' to all files, albeit only momentarily." See Williams, 592 F.3d at 522. Detective Campbell had a right of access.

All four factors of the "plain view" doctrine weigh in favor of admissibility. "[I]n this case, any child pornography viewed on the computer or electronic media may be seized under the plain-view exception." Id.

### 3.  Statements to Police

Labuda argues that his statements were illegally obtained, and he specifically objects to the Magistrate Judge's recommendation that his statements not be suppressed as fruit-of-the-poisonous-tree under Wong Sun v. United States, 371 U.S. 471 (1963). The Magistrate Judge concluded, and the Court agrees, that before the fruit-of-the-poisonous-tree doctrine applies, there must be some "primary illegality" that has led to the discovery of further evidence. Id. at 488.

Labuda argues that, because the inevitable discovery doctrine does not apply, his statements to Detective Campbell should be suppressed because: (1) Labuda's Miranda waiver was not knowing or voluntary; (2) Detective Campbell's mid-stream Miranda warning did not cure that defect; and (3) even assuming Labuda's waiver was knowing and voluntary, his confession was elicited by exploiting an illegal search from which the primary taint was not removed. (Def.'s Objections 8-9.) Labuda's objections are not well taken.

### a. Initial **Miranda** Waiver

The Fifth Amendment to the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment privilege against self-incrimination is implicated whenever "an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 478 (1966). Although Miranda establishes that suspects must be apprised of certain rights to protect against self-incrimination, a suspect may waive his Miranda rights "provided the waiver is made voluntarily, knowingly, and intelligently." Id. at 444.

There are two "distinct dimensions" to valid waivers of Miranda rights. Moran v. Burbine, 475 U.S. 412, 421 (1986). The voluntariness requirement ensures that admissions are "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). For a waiver to be knowing, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. The government must establish that "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite

level of comprehension" before the Court may conclude that a defendant's <u>Miranda</u> rights have been waived.  <u>Id.</u>

### i.  Labuda's Waiver Was Knowing

Labuda contends that his initial <u>Miranda</u> warning was insufficient to cover both interrogations.  He argues that his formal statement to police, which occurred after his first interrogation, was unknowing.  Labuda argues that, because his first interrogation addressed the sexual assault on the Victim and the second addressed the videos of the Child, he was given no indication that he would be interrogated for a "wholly separate offense" from that for which Romo had administered <u>Miranda</u> warnings.

After being <u>Mirandized</u>, a defendant's statements "may be used as evidence against him, provided the government can demonstrate that he 'waived his privilege against self-incrimination and his right to retained or appointed counsel . . . [under the] high standards of proof [set] for the waiver of constitutional rights.'"  <u>McKinney v. Ludwick</u>, 649 F.3d 484, 489 (6th Cir. 2011) (quoting <u>Miranda</u>, 284 U.S. at 475).  "This requires proof that the individual relinquished his rights . . . knowingly—'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  <u>Id.</u> (quoting <u>Burbine</u>, 474 U.S. at 421).  Courts assess "the totality of the circumstances to ascertain whether

[defendants] . . . possess[] the required level of comprehension." <u>Warlick v. Romanowski</u>, 367 F. App'x 634, 639 (6th Cir. 2010). "To be deemed knowing and intelligent, '[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.'" <u>Daoud v. Davis</u>, 618 F.3d 525, 529 (6th Cir. 2010) (quoting <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987)). Courts instead examine "'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" <u>Id.</u> (quoting <u>Garner v. Mitchell</u>, 557 F.3d 257, 261 (6th Cir. 2009)). That evaluation is a window into "whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." <u>Id.</u> "That does not mean, however, that the police must supply a suspect with enough 'information to help him calibrate his self-interest in deciding whether to speak or stand by his rights,' as such additional information goes only to 'the wisdom of a <u>Miranda</u> waiver, not its essentially voluntary and knowing nature.'" <u>McKee</u>, 525 F.3d at 435 (quoting <u>Spring</u>, 479 U.S. at 576-77).

Labuda's statements were knowing. "The courts have generally rejected a per se rule as to when a suspect must be readvised of his rights after the passage of time or a change in

questioners." United States v. Weekley, 130 F.3d 747, 751 (6th Cir. 1999) (collecting cases); see also Treesh v. Bagley, 612 F.3d 424, 431 (6th Cir. 2010). "[A]dditional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation." Id. at 432 (citing Wyrick v. Fields, 459 U.S. 42, 47 (1982)).

Detective Romo's interview had concluded just before Detective Campbell sought to interrogate Labuda. The circumstances had not "seriously changed." Id. Labuda's interrogations were conducted by different police officers, but "[t]ere is no evidence that anything affected [Labuda's] understanding of his rights between [the interrogations]." United States v. White, 68 F. App'x 535, 538 (6th Cir. 2003). "[R]e-warning is not required simply because time has elapsed." Id. Labuda's initial interrogation addressed the sexual assault on the Victim. That Detective Campbell asked Labuda to identify the male assailant in the video of the Child does not alter the circumstances in such a "serious" manner as to require a second Miranda warning.

### ii. Labuda's Waiver Was Voluntary

Labuda argues that "extraneous adverse consequences other than the results of ultimately being convicted of the crime" affected his confession. (Def.'s Objections 15.) He contends that his admission was compelled by Detective Campbell's offer

to have Labuda's girlfriend identify the participants in the videos. The Court understands Labuda's "extraneous adverse consequences" to have been "the fear of losing his primary relationship." (Id.) Labuda also argues that he had not received Miranda warnings and did not understand his rights because he had no criminal history. Based on those factors, Labuda contends that his confession "simply was not the product of free and rational choice." (Id.)

Voluntariness is determined by the totality of the circumstances. See Romanowski, 367 F. App'x 634, 639 (6th Cir. 2010). A voluntary relinquishment of a defendant's rights is "a product of a free and deliberate choice rather than intimidation, coercion, or deception." Ludwick, 649 F.3d at 489. "This court has stated three requirements for finding that a confession was involuntary due to police coercion: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." United States v. Stokes, 631 F.3d 802, 809 (6th Cir. 2011) (quoting United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999)); see also United States v. Hunter, 332 F. App'x 285, 288-89 (6th Cir. 2009). Factors to consider in this analysis include "the age, education and intelligence of the suspect;

whether the suspect was advised of his _Miranda_ rights; the length of the questioning; and the use of physical punishment or the deprivation of food, sleep or other creature comforts." _Jackson v. McKee_, 525 F.3d 430, 433-34 (6th Cir. 2008) _see also_ _Romanowski_, 367 F. App'x at 639. The Government must prove the voluntariness of the defendant's statement by a preponderance of the evidence. _See_ _Hunter_, 332 F. App'x at 289.

Neither Detective Campbell nor Detective Romo used physical force. Labuda had been given a _Miranda_ warning that was sufficient to cover his second interrogation. The interrogations were neither repetitive nor prolonged. The officers did not deprive Labuda of food or sleep. He had no criminal history, but he offers no evidence to show that law enforcement exploited his inexperience with the legal system to overcome his will. Detective Campbell's offer to use Labuda's girlfriend to identify the participants in the video was not coercive. It did not overbear his will. Labuda's statement was voluntary.

### b. Subsequent **Miranda** Warning

Labuda contends that his "formal statement," which was given after he admitted taping his six-year-old daughter and after the second reading of his _Miranda_ rights, was tainted by his "coercively-elicited confession to Detective Campbell." (Def.'s Objections 16.) Labuda argues that this case is not

like Oregon v. Elstad, 470 U.S. 298, 310-11 (1985), in which the Supreme Court held that "a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible." See also Missouri v. Seibert, 542 U.S. 600, 615 (2004). Labuda contends that "a reasonable person in [] Labuda's shoes 'could not have seen the [second round of] questioning [pertaining to the sexual abuse of the child] as a new and distinct experience,' and 'the Miranda warnings could [not] have made sense as presenting a genuine choice whether to follow up on an earlier admission.'" (Def.'s Objections 18) (quoting Seibert, 542 U.S. at 615-16).

In Elstad and Seibert, the Supreme Court considered the consequences of providing Miranda warnings after custodial interrogation had begun. In Elstad, officers interrogated the defendant without informing him of his Miranda rights, and the defendant confessed to robbery. Elstad, 470 U.S. at 300-301. Approximately one hour later, after the defendant had been transported to a police station, officers read him his Miranda rights and interrogated him again. Id. at 227. The Court decided that the first statement was inadmissible, but that the second was admissible. Id. at 305-07. The Supreme Court established a two-step test: whether the first, pre-Miranda statement was coerced, and if so, "whether that coercion has carried over into the second confession." Elstad, 470 U.S. at

310. When a statement is "unwarned but clearly voluntary . . . careful and thorough administration of <u>Miranda</u> warnings serves to cure the condition that rendered the unwarned statement inadmissible." <u>Id.</u> at 310-11. The Supreme Court went on to hold that "subsequent administration of <u>Miranda</u> warnings should suffice" to cure the condition. <u>Id.</u> at 313.

The Supreme Court clarified <u>Elstad</u> almost twenty years later in <u>Seibert</u>. The officers in <u>Seibert</u> intentionally refrained from informing the defendant about her <u>Miranda</u> rights, and, after persuading her to confess, read the <u>Miranda</u> warnings, had her sign a waiver of her rights, and resumed questioning immediately. 542 U.S. 604-05. Although the Supreme Court concluded that the police action was unconstitutional, the Court divided 4-1-4, and there was no majority rationale. A plurality held that a court must use a five-factor test to determine whether subsequent, post-<u>Miranda</u>-warning statements are admissible:

1) The completeness and detail involved in the first round of questioning;
2) The overlapping content of the statements made before and after the warning;
3) The timing and setting of the interrogation;
4) The continuity of police personnel during the interrogations; and
5) The degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 615. Justice Kennedy concurred only in the result, opining that statements should not be excluded unless the police deliberately violated Miranda. Id. at 620.

The Sixth Circuit has not explicitly adopted either Justice Kennedy's concurrence or the plurality's test. See Pacheco-Lopez, 531 F.3d at 427 n.11 (refusing to "resolve this issue" because the interrogation at issue was inadmissible under both tests). "Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent," and the Seibert analysis begins with that assumption. Id.

"It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings . . . so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Seibert, 542 U.S. at 620 (quoting Elstad, 470 U.S. at 309). "Elstad reflects a balanced and pragmatic approach to enforcement of the Miranda warning . . . [because the] officer may not plan to question the suspect or may be waiting for a more appropriate time." Id. Unlike Seibert, there is no evidence here that Detective Campbell used "a questioning technique based on a deliberate violation of Miranda." Id. He did not withhold Miranda warnings to "obscure both the practical and legal significance of the admonition when finally given." Id. Labuda was read his Miranda rights before the first interrogation.

That Detective Campbell asked Labuda additional questions is not a constitutional violation. "Skilled investigators often interview suspects multiple times." Id. Labuda's statement was not tainted.

If the Court follows the Seibert plurality, Labuda's argument also fails. The subsequent administration of Miranda warnings cured any and all violations that prompted Labuda's formal statement.[5] Labuda's interrogations occurred at the police station, but the questioning was neither "systematic, exhaustive, [nor] managed with psychological skill[]." See id. at 616. There is no evidence that Labuda's formal statement was obtained illegally or involuntarily. See Coomer v. Yukins, 533 F.3d 477, 490 (6th Cir. 2008). The Court has already concluded that Labuda's initial Miranda warning was sufficient to cover both interrogations. Even if the first Miranda warning were insufficient, "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Elstad, 470 U.S. at 314. "[A] reasonable person in [Labuda's] shoes 'could have seen the [] questioning [about the video] as a new and distinct experience,' and 'the Miranda warnings could have made sense as

---

[5] The Court has concluded that Labuda's first confession was voluntary and knowing. See supra.

presenting a genuine choice whether to follow up on the earlier admission.'" Yukins, 533 F.3d at 491 (quoting Seibert, 542 U.S. at 615-16). Labuda's formal statement was not tainted.

### c. The Confession Is Not Tainted

Labuda argues that, "[s]hould the Court determine that [] Labuda voluntarily waived his Miranda rights, the Miranda warnings were not sufficient, in and of themselves, to break the causal connection between the taint of the illegal search and [] Labuda's confession." (Def.'s Objections 18.) In other words, "[t]here was no break in the events that occurred sufficient to undermine the inference that [] Labuda's confession was caused by the Fourth Amendment violation of exceeding the scope of the search warrant for the cell phone." (Id.)

The Court has decided supra that the Cell Phone search did not violate the Fourth Amendment. There is no taint. Even if the search had exceeded the scope of the Search Warrant, Labuda's confession would be voluntary. See United States v. Wolfe, 166 F. App'x 228, 232 (6th Cir. 2006) ("[A] confession obtained through custodial interrogation following [a Fourth Amendment violation] must be excluded from evidence unless the confession was 'sufficiently an act of free will to purge the primary taint.'") (quoting Brown v. Illinois, 422 U.S. 590, 602 (1975)); see also United States v. Lewis, 110 F. App'x 569, 571 (6th Cir. 2004).

Voluntariness is not the sole inquiry. <u>Brown</u> articulated several factors to determine the admissibility of a confession following a Fourth Amendment violation:

> "The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an [underlying illegality]. But they are not the only factors to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant."

<u>Brown</u>, 422 U.S. at 603-04; <u>see also</u> <u>Wong Sun</u>, 371 U.S. 471, 488 (1963) (addressing whether "the evidence to which [that] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."); <u>United States v. Beauchamp</u>, 659 F.3d 560, 573 (6th Cir. 2011); <u>United States v. Clariot</u>, 655 F.3d 550, 555 (6th Cir. 2011); <u>United States v. Williams</u>, 615 F.3d 657, 669 (6th Cir. 2010) (applying the test in <u>Brown</u> where a defendant's inculpatory statements were elicited "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.").

### i. Voluntariness

Labuda's confession was voluntary. Neither Detective Campbell nor Detective Romo used physical force, Labuda had been given a <u>Miranda</u> warning that was sufficient to cover his second

interrogation, and the interrogations were neither repeated nor prolonged.

### ii. Temporal Proximity

Labuda contends that the "temporal proximity of the search that exceeded that scope of the warrant and [] Labuda's confession was likely minutes at best." (Def.'s Objections 20.) Although the timeline of Labuda's custody is ambiguous from the record, it appears that Labuda's characterization is correct.

"[T]here is no 'bright-line' test for temporal proximity." Wolfe, 166 F. App'x at 234 (quoting United States v. Reed, 349 F.3d 457, 463 (7th Cir. 2003)). The weight of authority supports that more than two hours is a sufficiently attenuated time frame to cleanse illegal conduct. See Brown, 422 U.S. at 604-05 (noting that Brown's first confession occurred less than two hours after his illegal arrest); United States v. Shaw, 464 F.3d 615, 628 (6th Cir. 2006) ("[T]he length of the detention, and particularly the fact that [the defendant] was interrogated for approximately eleven of the twenty hours he was held, does not weigh in favor of the Government's argument."); Wolfe, 166 F. App'x at 234 (a ten-hour detention was sufficient to cleanse the illegal detention); Baldwin, 114 F. App'x 675, 684 (6th Cir. 2004) (a two-month interval between a defendant's arrest and a second statement did not, standing alone, favor admissibility).

Although Labuda's confession and search were separated by a matter of minutes, the temporal proximity of the search and his confession is inconsequential. His argument turns on the existence of an illegal search, but Detective Campbell's search of the Cell Phone was constitutional. Because there was no illegal search, there can be no taint. Labuda's argument would be stronger if there had been an illegal search, but those are not the facts before the Court.

### iii. Intervening Circumstances

Intervening circumstances are closely tied to temporal proximity. See Baldwin, 114 F. App'x at 684. "The type of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the [underlying] illegal [search] and the discovery of the evidence." Reed, 349 F.3d at 457; see also Shaw, 464 F.3d at 628-29. The "'mere passage of time'" is insufficient to break the chain of causation between an illegal search or arrest and a subsequent confession. Baldwin, 114 F. App'x at 684 (quoting United States v. Grant, 822 F. Supp. 1270, 1278-79 (W.D. Tenn. 1993)). The administration of "fresh Miranda warnings" does not "sufficiently break the connection between an illegal arrest or search and a confession." Id. (citing Taylor v. Alabama, 457 U.S. 687, 691 (1982)).

The intervening circumstance in this case was the discovery of videos portraying the sexual abuse of Labuda's daughter. That discovery broke the chain between the search of Labuda's Cell Phone and his admission. "[T]he discovery of additional evidence . . . sever[ed] the connection between the challenged search of [Labuda's Cell Phone] and his subsequent confession." Id. at 685. Labuda's "voluntary decision[]" to speak to the officers about that evidence was an "act[] of free will sufficient to purge the taint of the illegal [search]," assuming arguendo that one existed. The intervening circumstances factor weighs in favor of admissibility.

### iv. Purpose and Flagrancy of Police Misconduct

Brown requires consideration of the purpose and flagrancy of the official misconduct. See 422 U.S. at 604; see also Wolfe, 166 F. App'x at 236. "This factor is particularly important . . . because it is linked directly to the rationale underlying the exclusionary rule—deterrence of police misconduct." Wolfe, 166 F. App'x at 236 (internal citations omitted). Considerations include whether "'the arrest, both in design and in execution, was investigatory . . . and also whether the arrest was calculated 'to cause surprise, fright, and confusion.'" Id. (quoting Brown, 422 U.S. at 605).

The police conduct was neither flagrant nor purposeful. "This was not a situation where the defendant was unlawfully [searched] in the hope that something would 'turn up.'" Wolfe, 166 F. App'x at 236. Unlike Baldwin, Detective Campbell engaged in "consensual" behavior because Labuda agreed to answer additional questions and view videos after his initial interrogation. See Baldwin, 114 F. App'x at 685. Labuda fit the description given by the Victim, who was riding with him, and he was "therefore naturally a suspect." Id. at 237. He was given Miranda warnings and interviewed on two separate occasions. "Because the primary purpose of the exclusionary rule is to discourage police misconduct, application of the rule does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." Id. (citation omitted). "[T]he conduct of police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of [Labuda's confession]." Id. (quoting Rawlings v. Kentucky, 448 U.S. 98, 110 (1980)).

**4. Revealing the Relevant While Shielding the Irrelevant**

The Government's final objection was not raised at the Suppression Hearing or addressed in the Magistrate Judge's Report. According to the Government, lawful seizure of Labuda's Cell Phone permits the lawful examination of the object, in the

same manner that the lawful seizure of a vial of blood permits the forensic analyzer to run whatever tests she sees fit. (<u>See</u> Gov's Objections 10) (citing Josh Goldfoot, <u>The Physical Computer and the Fourth Amendment</u>, 16 Berkley J. Crim. L. 112, 154 (2011). The Government argues that, "[b]ecause [Detective] Campbell did not act improperly, suppression would serve no prophylactic purpose . . . Instead, it would penalize the government for following established search and seizure procedure." (<u>Id.</u> at 10-11.)

The Sixth Circuit has "not squarely addressed whether a party may raise new arguments before a district judge that were not presented to the magistrate judge." <u>Glidden Co. v. Kinsella</u>, 386 F. App'x 535, 544 n.2 (6th Cir. 2010). However, "the Court [has] indicated that a party's failure to raise an argument before the magistrate judge constitutes waiver." <u>Id.</u> (citing <u>Murr v. United States</u>, 200 F.3d 895, 902 n.1 (6th Cir. 2000)); <u>see also</u> <u>United States v. Waters</u>, 158 F.3d 933, 936 (6th Cir. 1998) ("[I]ssues raised for [the] first time in objections to [the] magistrate judge's report and recommendation are deemed waived.") (characterizing <u>Marshall v. Chater</u>, 75 F.3d 1421, 1426-27 (10th Cir. 1996)). Although the record is unclear, it appears that the law review article on which the Government relies was available at the time of the Suppression Hearing. The author is counsel for the Government. "The magistrate []

never had the opportunity to consider this issue," and "absent compelling reasons," the Government is not permitted to "raise at the district court stage new arguments or issues that were not presented to the magistrate." Murr, 200 F.3d at 902 n.1 (citations omitted). The Government has not provided compelling reasons. The Government's argument is waived.

## IV. Conclusion

For the foregoing reasons, the Magistrate Judge's Report and Recommendation is MODIFIED, and, as modified, ADOPTED. The Motion to Suppress is DENIED.

So ordered this 11th day of April, 2012.

s/ Samuel H. Mays, Jr._____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE